The U.S. Embassy in the Philippines  The next argued case is No. 17-2577, Canadian Solar, Inc. v. United States Mr. Griffin, you and Mr. Sykes, you're dividing the principle argument, or have you designated a shift? I see that you are taking 10 minutes. Mr. Sykes says 5 minutes. Is that for rebuttal? Yes, that is correct, Your Honor. I will take 10 minutes, and my colleague, Devin Sykes, will take 5 minutes for rebuttal. For rebuttal. Okay. If that's all right with the Court. When you are ready. Thank you. Thank you, Judge Newman. May it please the Court, my name is Spencer Griffith here today on behalf of appellants. This case is about the Commerce Department's scope determination in solar panels from China called Solar II. The Commerce Department here issued a scope determination that was arbitrary and not supported by substantial record evidence and which failed to provide a reasoned explanation for why it treated similarly situated situations differently. You go back and forth between talking about whether the statute is ambiguous or talking about whether or not this is simply a question of a state farm problem because they changed their process. I actually read your state farm argument to say, all right, we agree the statute says that commerce defines what the class of kind of merchandise is, and it's just a question of whether they can define it one way in one proceeding and another way in another proceeding without a reasoned explanation. Is that correct? Yes, Your Honor, that's essentially correct. As we state in our briefs, it's our position that the statutes that the Commerce Department relied on in its remand decision, the Department says that the class or kind is proceeding specific, and therefore, essentially, the Department's position is it did not matter that they reversed themselves on the country of origin test in Solar II from what they used in Solar I because they say each of those determinations is proceeding specific. Well, but I'm really trying to determine what legal framework we're in. Okay. So, I mean, at least my take is that this statute is not ambiguous. It just doesn't address proceeding specific or non-proceeding specific. It simply says that commerce determines and sets the class of kind of merchandise based on the at each investigation. Do you agree with that? Yes, Your Honor. We do agree. As we state in our briefs, we believe the statute is silent on this issue of whether or not the class or kind definition is proceeding specific. Okay. But we then go on, Your Honor, in our briefs, and it's our position that that doesn't really matter. The issue is not whether the statute addresses or doesn't address that specific issue. The issue is that the agency has an independent obligation. It's a basic axiom of administrative law that it has to adequately explain with a reason and explanation why it treated similarly situated situations differently. So they had the right in the first case. You're not complaining about the first time when they defined what the class of kind of merchandise was. That's correct. You're just saying, again, you're under State Farm. You're saying that it was arbitrary and capricious to change that definition. That is correct, Your Honor. It's our position. We are not challenging in any way. Let me put it in my words to make sure I'm on the same playing field as you and Judge O'Malley. If this was the first case of its kind dealing with the supply chain with multiple countries participating in the ultimate production of some merchandise that eventually gets imported into our country. And so this is the first case like that. And Commerce had never employed the substantial transformation test. And so this is the first case. And they decide that China is the country of origin here. Under these circumstances in Solar II, it would be your point of view that there's nothing wrong with that. And that Commerce would have a clean lane to be able to say, yes, these particular goods being assembled in China. China is the country of origin. Aha, I see subsidies being applied here from the government. I see the unfair pricing structure going on here. So Commerce is now going to apply anti-dumping duty as well as a countervailing duty. You'd have no problem under those circumstances. Thank you for clarifying the question, Your Honor. But we would have a problem. Our position rests on two legs, Your Honor, and in response to Judge O'Malley's question as well. Number one, their reversal in this present appeal, Solar II, from when their position was in Solar I, is arbitrary. And they haven't explained with reason and explanation why they reversed themselves in Solar II. That's the first leg, Your Honor. The second leg is that independent of the arbitrariness of what they did reversing themselves, separately and independently, they didn't rest on their decision on substantial record evidence in making their determination here in Solar II. So following up on your example, Your Honor, even if there was no Solar I, it's still our position that this Solar II country of origin determination is not supported by substantial record evidence and is an invalid determination. We think our position is only strengthened by the fact that we have this very unusual circumstance here where we have the agency 100 percent contradicting itself on its country of origin test from Solar I to what it's doing in Solar II. And so, Your Honor, to be clear, we're resting on those two legs. Right, but again, putting aside the change, if this was the first time, as Judge Chen said, your argument would not be that they didn't have the authority to do what they did in terms of setting it, but they didn't base it on sufficient record evidence. That is correct. We are not challenging that the agency has the authority under the statute to define country of origin. Indeed, country of origin is essential. The department has to do two things in a trade case. Number one, they have to define the product they're looking at. Here it's solar cells and modules, the things you see on the roofs of houses and buildings. Secondly, they have to define where is that product from, what country did it originate from. Many products in today's global supply chain world are produced in different elements or produced in different countries. So it's always an essential issue before the agency. Where, for our purposes, for these trade cases, where is this product from? And that's the country of origin test. So there's two legs. Number one is what is the product, and number two, what's the country of origin for the product? All right. And they have both the obligation and the authority to do both of those things as long as they base it on substantial evidence and they don't act arbitrary and capriciously in the process. Yes, that's our position, Your Honor. Okay. We're not challenging the underlying authority of the agency to make a country of origin determination. It's the peculiar facts of this case and the reasoning they employed in this current Solar II appeal that we are currently challenging, Your Honor. So, again, let's put aside the change because we'll get back to that in a minute. But what was lacking in the record evidence to support the conclusion? So if this was the first time ever, why was the record evidence not sufficient? Okay, Your Honor. So thank you for the question. In the challenged appeal, Solar II, let's look solely at the record of this current challenge investigation. The agency's determination rested on essentially two legs. Number one, that the petitioner here was alleging that the harm at issue was alleged Chinese subsidies to the assembly operation in China. And number two, that there was also a desire to effectuate petitioner's intent, that the petitioner wanted to pick up harm caused by subsidies to assembly in China. Okay. Putting to one side, in response to your question, the fact that they have never before used this test. There is a 30 to 40-year history of the Commerce Department applying the substantial transformation test to determine country of origin. There is not a single other case besides this challenged appeal in which they have ever not used the substantial transformation test. So all of a sudden, in this case, they invent a new test. Is it possible it's a unique fact pattern here? Your Honor, we certainly recognize that the agency has discretion to determine country of origin. And we also acknowledge in our briefs that the statute is silent on how the agency has to determine country of origin. That's up to the agency's discretion. And so the agency doesn't have to blindly and rigidly adhere to just one particular conception of how to go about that? That is correct, Your Honor. We acknowledge in our briefs the statute. But circumstances might warrant a different way of thinking about the issue. That is correct, Your Honor, if the evidence supports that determination. We are not saying the agency as a matter of law could not use a new test, but we are saying here that the record doesn't support it. I'm sorry. I interrupted your answer to Judge O'Malley's question. You can go back to that. Okay. Let's go back to that. What's wrong with the evidence that they rely on? Okay. The ---- Could you shift it back into the case? Sure, sure. And you got me provoked. If you look at the remand determination that the agency issued, you have to focus on footnote 131 in the remand determination. The government in its brief here cites three separate times the footnote 131, and it is the only enunciation of alleged record evidence supporting the agency's decision. There's two problems with footnote 131. One, it cites only to two things, the Petitioner's allegations in the petition, and secondly, the agency's own decision memo. It cites to no other record evidence. Allegations in a petition are not record, substantial record evidence upon which an agency can base its determination. They are allegations which the agency determined were sufficient to justify initiation of the case, but they do not serve as record evidence. And secondly, an agency can't cite to its own determination to cite record evidence that's supporting its own determination. That's circular. So footnote 131 talking about all these statements from Chinese companies and the U.S. importer about reversing their supply chain in order to avoid having to pay duties, that's not substantial evidence? Those were allegations in the petition. The agency made no, none, independent factual investigation or fact-gathering or verification of any of those allegations. They are mere allegations in the petition, and it's our position that mere allegations in a petition by themselves, which is all the agency has, can constitute substantial record evidence. I can't remember. What did Judge Kelly say about this, about this question on substantial evidence? I don't believe that Judge Kelly addressed this issue. She said that the agency's rationale was sufficient because the agency explained why it reversed itself on the SOLID I determination. She focused more on that aspect. I don't believe, Your Honor, that she independently addressed the substantial evidence issue that we've raised in our briefs. Let's hear from the other side, and we'll save your full time for Mr. Sykes. Thank you, Your Honor. We'll hear from Ms. Melvin. Ms. Melvin. Good morning, Your Honors. May it please the Court. Can you go straight to the substantial evidence question? Sure. Yes and no. I think substantial evidence might not be quite the right way to describe it. I mean, there is petition. There were declarations. In terms of the substantial evidence or the evidence on the record that Commerce relied upon to depart from its normal practice, there were declarations or statements on the record from Chinese solar manufacturers saying that they had changed their supply chain. There were news articles. And importantly, the Chinese respondents here have never, ever disputed that this is exactly what they did. When you say there were statements on the record, were there statements other than in the petition, other than what you took from the petition? There were statements from the petition, yes. There were statements from individuals with knowledge that were contained in the petition. But you're saying we should just take those as true? In the absence of contrary record evidence and with, again, the fact that the respondents here, as Judge Pogue noted on pages 25 and 26 of his opinion, they agree. They've never challenged the fact that the respondents did, in fact, change their supply chains in order to avoid paying the duties that were imposed as a result of Solar I. So that's the factual record. Those are the facts that are on the record that Commerce used in part to justify its reason for departing from substantial transformation as the way to look at country of origin in this case. So in your view, the burden was on the challengers to convince you not to change your 40-year procedures? The burden is on the agency to, when it does depart from an established practice, to articulate a reasoned explanation for doing so. We think Commerce has done that. All right. But your explanation can rely solely on allegations made by a petitioner and not on an actual examination of the underlying evidence to support those allegations? I think it's not quite right to say that they were relying solely on allegations. They were relying upon the factual declarations and news reports that were supplied with the petition. And there's no contrary record evidence that the respondents supplied to suggest that this wasn't actually the case. Everybody agrees that this is actually what was happening. So given that, it – Are you basically arguing a forfeiture type of argument? This was waived? I'm not arguing a forfeiture argument. You mean for us to consider that as a live issue at the appellate stand? It's somewhat extraordinary that they're making this argument in the reply brief, given that before the trial court, in their briefing, they never challenged that finding. They conceded that this is actually what the Chinese manufacturers were doing. So I don't understand. So then why isn't it a forfeiture argument? So I suppose we could call it a forfeiture argument. I would suggest that to the extent that the Court was concerned about commerce's rationale not being supported by some factual basis, I think that that factual basis is found in the record and is not disputed by the respondents. So do you agree with your friend on the other side with respect to the legal framework that we're in? Because there was a lot of discussion about whether the statute was ambiguous in that, and yet I don't see that as the actual argument they were making. In order to understand, I think in order for us to show the Court why their argument is wrong, we do need to go back to the language of the statute. And the language of the statute ties class or kind of merchandise specifically to an investigation or an order. So the class or kind of merchandise, as Mr. Griffiths correctly says. Right. They concede that the statute gives the authority to commerce to make those determinations and that it doesn't define what it has to be or how you decide country of origin. So I just don't understand the whole Chevron discussion. Your Honor, I don't think Chevron is necessary except to the — Chevron comes in to the point where Congress has not spoken directly as to how commerce is to define class or kind of merchandise or to do a country of origin analysis when it's appropriate. The Respondents concede that. What Congress has spoken directly to is the fact that class or kind of merchandise is tied to the investigation or the order at issue. It is not some sort of generic term. But even if that's true, isn't it true under State Farm that if you have a 40-year policy of analyzing these questions under one test, that to change the test for just one investigation when you haven't changed it for any other investigation is arbitrary implication? It is not arbitrary when the agency explains its reason for departing from its practice. And here it did so, and it did so also by providing the parties an opportunity to comment on the scope before it reached that decision. Explanations have to be reasonable. It's just not enough to just provide explanations. They have to be reasonable explanations or reasoned explanations. Right. And we believe that commerce has done so. So if the Court looks at pages 542 and 583 of the appendix, commerce says, we agree, we concede. Substantial transformation is normally how we evaluate substantial transformation. And that's what we did in Solar I when we were looking at solar cells and solar cells that were assembled into panels and laminates. But there are new facts and unique circumstances of what happened after that that warrants a departure from that. And it is specifically that the unique nature of the solar products industry in terms of this very adaptable supply chain, the concern that, in fact, petitioners had proposed a slightly different scope language in Solar II that would have looked at the country of origin for the ingots or the wafers that become the cells, and commerce said that that would not be administrable because the respondents don't keep track of their supply chain in that way. And three, commerce needed a mechanism to address the harm alleged by the petitioner. And that harm was specific to the panel assembly in China. It was not specific to the cell production. Well, what about the fact that there was a finding that, in fact, parties relied upon that said we're not talking about those panels that are manufactured in China or assembled in China? I mean, why couldn't importers rely upon commerce's determination and specific reference to that fact in making their ultimate decisions? They certainly can, Your Honor. And I think that they would argue that that was good business sense on their part to adapt their supply chain so that they didn't have to pay the duties. That doesn't preclude commerce from – that doesn't constrain commerce's authority to investigate allegations of unfair trade practices. And as here, commerce found and the ITC found in their respective investigations that there was positive dumping, there was countervailable subsidies, and there was harm to the domestic industry that was specific to panels. And so where that's the case, commerce has the authority under the statute to impose duties to address those unfair trade practices. So it's not that there was anything wrong or illegal with what they did, but that doesn't constrain commerce in any way from addressing harms that are subsequently alleged in light of the facts that came forward after the imposition of solar wind. Has commerce ever before affirmatively said that we believe this class or kind of merchandise determination is proceeding-specific and we can change longstanding policy on the basis of a proceeding other than here? Commerce has never said proceeding-specific. I think that language actually comes from the Court of International Trade. What commerce has relied upon is the language of Section 1677.25 that talks about a class or kind of merchandise being tied to the scope of the investigation or the order. Okay, but so has commerce ever, whether it be the transconfiguration test or not, ever gone from one circumstance where you're looking at a type of merchandise and then in another proceeding say we're going to apply a different test? Did this ever happen? These are very unique circumstances. I think probably maybe the closest that has been cited is the DRAMS from Korea case, but actually what commerce said there was, and that had to do with semiconductors, and so we were looking at whether the wafer or the semiconductor would confer country of origin. Commerce said in the absence of other evidence to suggest that there's a reason to depart from our normal test, we're not going to depart from our normal test. Here commerce found that there were facts on the record, undisputed facts on the record to suggest that applying its substantial transformation test and using the cell as the country of origin would not be sufficient to address the harms and the injuries that were specifically alleged with respect to the panels. And the fact remains we have three, we haven't talked about Taiwan, but there are three sets of orders. Each of them cover different merchandise. There is no overlap. There's no one piece of solar panel that comes to America and that is subject to more than one of these sets of orders. In the Taiwan case it reverted back to the old test. In Taiwan commerce said that there was no reason not to do something different. I understand commerce's theory, which is that we're talking about literally different products, different physical products in each given seating. So therefore, solar one, although the American consumer, these products would look essentially identical, they're literally different products. Solar one, the solar cell is made in China and assembled somewhere else, Taiwan I presume. Solar two, the solar cells are produced in Taiwan and then assembled somewhere in China. And so therefore, in your view, these are two different proceedings dealing with two different products sourced in different ways using the inverted supply chain. What if proceeding one, the solar cells were, I don't know, made in Beijing and assembled in Taipei and then proceeding two, the solar cells were made in Shanghai and assembled in Taipei. Would you say, oh, well, those are different products because the solar cells came from a different part of China and so therefore, we can use a completely different analysis for this proceeding, proceeding two, in determining what is the country of origin. Would that be a logical way of thinking about why these are different products? Well, what Congress would need to look at is what is directed to do under the anti-dumping and countervailing duty statute. And that's tied to the exporting country. So, and candidly, you may have reached the extent of my knowledge of Chinese geography, Your Honor. But, so what Congress is looking at is the exporting country. And so, is there unfair subsidization going on in the exporting country? Is the sale of the product in the exporting country, is the sale in the United States less than that home market? Right. I'm trying to test what your understanding is of why, in your view, these products are not so similarly situated. One rationale is, oh, these are different products. This is one product, that's another product. These are two different proceedings. They look identical, but they're literally different products. So therefore, we can do something different. And so therefore, they're not similarly situated. I don't know if that's enough, but here you might have more, which is this particular product, the solar cells came from country one and then were assembled in country two. Whereas this one, although it looks the same, it's the opposite. The solar cell was made in country two and then assembled in country one. And then thirdly, I guess you could say that for this one, the subsidy, the unfair trade subsidy was occurring at the solar cell level. Whereas in this one over here, the unfair trade subsidy was happening at the assembly level. And so therefore, when you combine all three of those things, that's a sufficient enough basis to say these are not similarly situated. They're differently situated, and under the circumstances of this case, we can go ahead and consider perhaps a different way of thinking about country of origin. I'd like to hear your comment on this. Yes. That's it? You do start with the scope language to look at the physical description of the merchandise, and those physical descriptions are all different. Solar one talks about solar cells that may or may not be assembled into panels or modules, and it specifically excludes assembled panels that are made from cells from a country other than China. In solar two, we're looking at solar panels and solar modules. That's a different product. And specifically, we're looking at those panels and modules that are assembled using cells that come from a different customs territory other than China. So to the naked eye, the panel might look exactly the same, but the way that they are put together and the unfair trade practices that were alleged are specific to the way it's put together. Is that helpful? Thank you. Okay. So you were sharing some time with Mr. Broccoli? Yes. Still want to do that? Thank you, Your Honor. I don't want to use this time, but we shall restore it. Okay. You have three minutes or any new points that you want to make? Thank you very much, Your Honor. May it please the Court. Three points. First, appellants challenge whether there was record evidence to support a different country of origin finding. Here there clearly was, and I know that because we put a lot of it on the record as petitioners. But it's factual information. It's not allegations. It includes import data showing the surge of imports from China of Chinese modules containing non-Chinese cells. It's also factual statements of five companies, including the CEO of Canadian Solar, who said that in a Reuters article from July 2012, while the first case was still going on, all U.S.-bound solar modules would be made with slightly more expensive Taiwanese cells to avoid the tariff. To avoid the tariff. That's appendix page 42. So our petition provided sufficient factual evidence that there was a shift in trading patterns that occurred as a result of Solar One. That necessitated the second case to cover Chinese modules. That is factual evidence. And it is sufficient, even though it was in the petition on a legal and policy grounds. So why was it okay for to use country of module assembly as country of origin? Well, that's where the dumping was coming from. That's where the subsidies were benefiting production. And that's where the injury was coming from as well. Second point, I would say there are important legal and policy reasons why Commerce's to govern all cases for covering country of origin. As Judge Chen pointed out, there was a unique fact pattern here. That's what Commerce said. And that's what the Court of International Trade underneath said as well. There was a unique fact pattern, a wholesale switch in supply that justified using a different country of origin test in this case. And the court found that the differing rules of origin are tailored to cover the particular solar products and reflect the particularly injurious activity discovered by each investigation. The third point, the appellants don't challenge the lawfulness of what Commerce did, only the explanation. And there was clearly enough explanation here. You can see that on page 23 of our brief. Commerce more than adequately explained the disparate treatment of similar situations here. The products are differently situated. That answers your most recent question. Again, different products being dumped. A Chinese module made with Taiwanese cells is different in terms of dumping effect. It's different in terms of subsidies being provided to China as opposed to some other country and different in terms of the injury that it caused to our U.S. industry. And the court upheld that analysis as reasonable and said that Commerce adequately explained its deviation from prior practice here. Thank you very much. What do you think is the definition that Commerce used here defining the country of origin? Substantive transformation test is easy to wrap your mind around. It's basically where in the supply chain is the – I guess the biggest value being injected. And then if it's the solar cells, then it's the – that's the country where you define as the country of origin. And anything after that, the mere assembly is not a substantive transformation. Here, it seems like without knowing more, it's wherever there is some kind of unfair trade practice being injected into the supply chain, that will be the country of origin. Is that the right way to understand how Commerce is behaving here? Well, I think – first of all, Your Honor, I think Commerce did acknowledge that module manufacturing is an important step in the process as well. As you will recall from – Substantive transformation. No. But in actuality, probably a majority of the manufacturing occurred in China because the wafer that made the cell was made in China. And then you have the module that the cells were made out of also made in China. I don't see Commerce relying on that initial manufacturing step that you're referring to. No, they don't. But I think they did acknowledge the importance. So then that can't be part of what they relied on to decide why China, in this instance, is the country of origin. Well, I think they relied on, first of all, that module manufacturing was important. But then I think they really went to the fundamental purpose of the trade laws and how it would be frustrated by an approach that locked Commerce into substantial transformation. You have to be able to move away from that if the injury is being caused in those other steps, even if there is not what Commerce or Customs would deem a substantial transformation. So I think that's what Commerce was attempting to do, was justify. We filed a petition. The petition alleged injury. It alleged dumping and subsidies not tied to cells but to the product as a whole, and therefore it's allowed to address that behavior. But don't importers have some right to rely on the tests that Commerce has employed for years and years and years? All parties acknowledge that it's a practice, but they can deviate from it with a reasoned explanation. So you're only allowed to rely to that extent. We had to go to the extent of filing a second trade petition to address this additional harm. All the parties were clearly on notice that we were trying to address the unfair trade no matter what form it occurred in. I guess the question here is whether we have a new circumstance that requires a new way of thinking. If there were 400 other examples of foreign manufacturers inverting their supply chain to avoid a duty order and Commerce did nothing about it, then maybe there would be an expectation for these importers to expect the same treatment for them. But that's not the fact pattern that we have. Well, the fact pattern we have is that even while the first case was going on, dozens of producers were changing their supply chain to try and find a way to not have to pay the duties. And this is becoming, from a policy perspective, it's becoming more common that the supply chains are global. So I think Commerce has to have some flexibility. It can't be tied to the same approach that it's used. And I think Commerce did articulate the reason why it deviated and the logical way that it found that these products are properly subject to trade remedies. So it's okay to have no consistent test? It's important to have a test that you use in most situations, which was used for Taiwan in this case, but to deviate from it with a reasoned explanation. And what the court and Commerce acknowledged was a unique fact pattern. It was unique, and it undermined the relief that my clients were entitled to. Thank you very much. Thank you, Mr. Bradfield. Mr. Sykes, it seems to me that Mr. Bradfield has raised the issues of what this case is really all about. Would you comment on the issues that he's raised concerning evasion and so on? Oh, absolutely, Your Honor. And may it please the Court, good morning. My name is Devin Sykes with Akin Gamba here on behalf of balance. With respect to evasion and circumvention concerns that Mr. Bradfield has just identified, and Commerce identified this as well throughout its remand determination, the petition contains allegations on shifts in trade flows, but it's just that. It's allegations. Commerce at no point independently confirmed the veracity of those allegations. And let's just set aside for a moment. Let's accept that those are true. Commerce never demonstrates how allegations or proof of shift in trade flows demonstrates that module assembly confers origin. It never happens in the record, ever. So your CEO not following the rule that says don't ever talk to the press, that wasn't meaningful? No, that's relevant for purposes of circumvention, and Commerce has other tools that it can use to address circumvention with respect to products purportedly circumventing the Solar One order. Absolutely. But not for purposes of demonstrating country of origin. The module assemblies confer country of origin in this case. So is it your view that it's simply good business practice to get around the duty as long as you're not violating an existing order? That's true. And I also think, though, Your Honor, it's important to keep in mind that the Solar One orders can in fact account for these subsidies. As you know, Solar One concerns solar cells produced in China that are later assembled into panels and modules in China. So to the extent that, and as you know, Commerce conducts administrative reviews of CBD orders, and to the extent there's a Chinese manufacturer who benefits from those assembly subsidies, Commerce can go after those subsidies and determine whether that manufacturer benefited. Now, to be fair, that scenario would not cover a situation in which solar cells produced in a third country are imported into China and then assembled into modules and panels. But Commerce itself has acknowledged in past cases like DRAMs from Korea, pistachios from Iran, butwell pipettings from India, Judge Polk discusses these cases on pages 518 and 519 of the Joint Appendix, that because of the particular way in which a product is manufactured, some subsidies might be beyond the reach of the CBD law. I want to touch on some of the other issues that the judges have raised so far today. Again, footnote 131, this is on page 585 of the Joint Appendix. This is the principal discussion where Commerce grapples with the record evidence on country of origin. I think it's beyond dispute that a decision memoranda, and plural decision memoranda, are not record evidence. For the reasons I just explained, allegations on shift in trade flows, even if accepted as true, don't demonstrate that module assembly confers origin. What about the fact that there was no dispute about those allegations? That's actually not true, Your Honor. If you turn to page, let's see, this is JA 469, 470, and 471. Below on the comments in the opening brief, appellants did raise and contest whether substantial evidence supported the country of origin finding. I'm sorry, 4? Sure. Take, for example, page 470, the middle paragraph. One second. Yep. Okay. Let's see, this would be the third sentence in that paragraph, beginning with, All that Commerce has relied upon to justify a Solar II scope is speculation, statements by Solar World, and statements of policy. No part of the so-called analysis makes reference to record developed during the investigations or to any characteristics of the product which is presumably being analyzed for determination of its country of origin. If you flip over to page 170, the last sentence of the first full paragraph there, Other than referring to the petitions, Commerce cites to no fact-finding that would explain the relevance of this broad statement to the country of origin determination. We made that argument below. Were there actual declarations in support of the petition? In support of the petition, absolutely, and that evidence is relevant for purposes of initiating an investigation, which Commerce did. But you're saying that it's not relevant for purposes of defining the scope of the investigation? For purposes of the country of origin. Whether a module assembly itself confers origin. So what more would they have had to do, is to put those same declarations back into the record? No, Commerce would have to then take the additional step of confirming whether other evidence submitted during the record confirms in fact that module assembly confers origin. But again, I think just taking a step back, shifts in trade flows, which is what those declarations state, it's not relevant to whether a product originates from country A or country B. Because? Because it's irrelevant. The shifts in trade flow don't show that module assembly involves so much, you know, I don't want to use words from a substantial transformation test, because as we've explained, Commerce is free to devise a test because it's not compelled by statute to use a particular test. But it's not relevant because it doesn't definitively show that module assembly confers origin. I'm trying to understand this whole country of origin inquiry. It feels like you seem to be arguing it as an end, whereas I think the other side is thinking about it more of a means. And I'm trying to understand why, I mean, maybe country of origin is more of a tool to try to understand, you know, whether or not there's an unfair trade practice. Sure. Relating to the subject of merchandise that actually comes onto the U.S. shore. Sure. So just taking a step back, the starting point for all of this is the fact that Commerce, since 3.5 inch micro disks in 1985, has said that the scope involves two parts. Class or kind of merchandise and country of origin. So this is a requisite component of Commerce's analysis. So here we're presuming that Commerce is going to follow what it's done before and identify where the particular product comes from. And in other cases like Belgian steel plate, Commerce has recognized that it can only investigate products that come from the subject country, the subject country being the one named in the petition. Here, China. But I thought in the opening argument we had already all agreed that if this was the very first case with a supply chain going across multiple countries, that if Commerce had done what it did here in Solar II, that would have been fine and acceptable under the law. Yeah, I think actually my colleague, Spencer, said that we would still debate that finding because In terms of the authority. For what test to use? That's absolutely correct. Commerce has the authority to use either the substantial transformation test or a different test so long as it explains its reasons for using a new test. And of course to do that, as you know, it has to base that new test on policy and an adequate explanation which involves some factual support for that new policy. So is it your position that the test was not properly defined or that there was no evidence to support what they defined to be the test? We argue both. In our opening brief, we talk about how Commerce said it conducted some sort of additional analysis, but it never lays out what that additional analysis was. And we also argue that substantial evidence doesn't support the ultimate country of origin finding that Commerce made here, that is, that the modules originate from China. Your gray brief brings up the idea that there's not enough record evidence to support the finding of what's going on with all these reverse trade flows or supply chain flows. But I didn't see that in the blue brief. Where was that in the blue brief? We did address the substantial evidence arguments. If you're asking whether the shifts in trade flows in particular, that was supported by substantial evidence. Yeah, yeah. I have to be honest with you. I don't know if we made that specific argument in our opening brief. I think we were responding to the arguments that the government in SolarWorld made in its response brief. So that's why we probably included them in more detail in our reply. Are there any further questions? Thank you, Your Honor. All rise. The Honorable Court is adjourned until tomorrow morning at 10 o'clock a.m.